## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **SUNLIGHT OF THE SPIRIT HOUSE, INC., ET AL.,** | : | **CIVIL ACTION** |
| | : | |
| *Plaintiffs*, | : | |
| | : | |
| **v.** | : | **No. 16-cv-909** |
| | : | |
| **BOROUGH OF NORTH WALES, PENNSYLVANIA, ET AL.,** | : | |
| | : | |
| *Defendants*. | : | |

**Goldberg, J.**                                                                                          **January 15, 2019**

### Memorandum Opinion

Plaintiffs, Sunlight of the Spirit House, Inc. ("SOS House") and Matthew Bartlet, bring this civil action against Defendants, Borough of North Wales (the "Borough") and the Zoning Hearing Board of North Wales (the "ZHB"). Plaintiffs allege that Defendants violated the Fair Housing Act, 42 U.S.C. § 3604 (the "FHA") and the Americans with Disabilities Act, 42 U.S.C. § 12132 (the "ADA") by denying them a reasonable accommodation that would permit more than three unrelated individual residents to live together. Specifically, Plaintiffs assert that Defendants' denial was discriminatory and improperly based upon the residents' disabilities of drug addiction and alcoholism.

Both parties have moved for summary judgment. After careful review of the record, I conclude that this case will have to be resolved by a factfinder, and for the reasons stated below, I will deny all dispositive motions.

# I. PROCEDURAL BACKGROUND

Plaintiffs filed their Complaint on February 25, 2016, alleging that Defendants violated the FHA (Count One) and the ADA (Count Two). Plaintiffs' lawsuit stems from an application to the ZHB, requesting a special exception to the Zoning Ordinance that would allow Plaintiffs to open a "sober housing" facility for persons in recovery from alcoholism and drug addiction. Plaintiffs allege that, as part of this application process, Defendants engaged in discrimination in voting against the special exception by failing to discount the impermissible prejudices of the neighbors' opposition, and were instead influenced by those prejudices. Plaintiffs further claim that Defendants failed to consider the request for a reasonable accommodation for the SOS House Residents to be treated as a family under the Zoning Ordinance, and that Defendants provided pretextual reasons for the denial.

# II. FACTUAL BACKGROUND

Unless otherwise indicated, the following facts are undisputed:

## A. The Parties

1. The Plaintiff, SOS House, is registered as a Pennsylvania nonprofit corporation in Lansdale, Pennsylvania. The mission of SOS House is to "provide safe and sober housing for persons in recovery from alcoholism and drug addiction." (Compl. ¶ 3.)

2. Plaintiff Matthew Bartlet is the 50% owner and president of SOS House. (Bartlet Dep. 10/12/17 at 10:15–17, ECF No. 42 Ex. B; N.T. 9/1/15 at 87:1–89:2, ECF No. 42, Ex. D.)

3. Matthew Douglas, who is not a party to this lawsuit, owns the other 50% of SOS House and serves as the vice president and treasurer. (Douglas Dep. 10/12/17 at 31:22–32:1, ECF No. 42 Ex. C; N.T. 10/6/15 at 11:25–12:3, ECF No. 42, Ex. H.)

4. Initially, on August 4, 2014, SOS House was formed by Mr. Bartlet and Mr. Douglas as a for-profit limited liability company. (Douglas Dep. 10/12/17 at 22:10–18, 27:1–6, ECF No. 42 Ex. C; N.T. 9/1/15 at 99:1–7, ECF No. 42, Ex. D.) In July of 2015, based on the advice of their attorney, Mr. Bartlet and Mr. Douglas changed SOS House from a limited liability company to a corporation under Pennsylvania state law. On August 5, 2015, the Commonwealth of Pennsylvania accepted SOS House

as a nonprofit corporation for Pennsylvania state law purposes. While SOS House is a nonprofit corporation, it has not sought tax exempt status from the Internal Revenue Service under Internal Revenue Ordinance § 501(c)(3). (N.T. 9/1/15 at 67:13–68:19, 86:17–88:23, ECF No. 42, Ex. D.)

5.  Defendant Borough is a Pennsylvania municipal corporation. The Defendant ZHB is responsible for interpreting the Borough's Zoning Ordinance. (Compl. ¶¶ 5–6.)

6.  The relevant property is located at 500 E. Montgomery Avenue, North Wales, Pennsylvania (the "Property"), which is located within the Borough. The Property is a half of a twin home structure that shares a wall with the remaining half of the structure. The Property is a five bedroom, two bathroom home. (Douglas Dep. 10/12/17 at 18:5–10, ECF No. 42 Ex. C; N.T. 9/1/15 at 21:1–5, 48:2–22, 57:4–58:14, 65:8–67:10, ECF No. 42, Ex. D.)

7.  Mr. Bartlet purchased the Property on May 14, 2015 and spent approximately $65,000 in renovations because "it wasn't able to be lived in . . . it was completely destroyed." (N.T. 9/1/15 at 18:21–19:15, 20:15–22:16, ECF No. 42, Ex. D.)

8.  On August 5, 2015, Mr. Bartlet and SOS House entered into a lease agreement, wherein Mr. Bartlet was the landlord and SOS House was the tenant. (N.T. 9/1/15 at 18:21–21:24, ECF No. 42, Ex. D; Lease Agreement §§ 21.C–21.J, ECF No. 42, Ex. G.)

## B. The Zoning Ordinance

9.  The Borough's Zoning Ordinance divides the Borough into fourteen different types of zoning districts. The Property is located in the "R-C Residential" zoning district on a street that is restricted to permit parking. (Borough of North Wales Ordinance No. 796 § 208-9, ECF No. 42 Ex. F; Douglas Dep. 10/12/17 at 18:5–10, 117:1–4, ECF No. 42 Ex. C; N.T. 9/1/15 at 52:16–25, ECF No. 42, Ex. D; Borough of North Wales Ordinance No. 607 § 42(c), ECF No. 42 Ex. O.)

10. The R-C Residential District is limited to dwellings for families. (Borough of North Wales Ordinance No. 796 §§ 208-46, 208-47, ECF No. 42 Ex. F.) The Zoning Ordinance defines a "family" as follows:

> A. The definition of family includes:
> * * *
> (4) A greater number of three unrelated persons, occupying a dwelling unit as a family, provided the Zoning Hearing Board shall grant a special exception after ascertaining that the dwelling unit has adequate off-street parking facilities, living space, indoor plumbing, and operating as a single, nonprofit and non-transient housekeeping unit and facilities to do their cooking on the premises which constitute a functional family

3

equivalent and complying with the requirements of the Uniform Construction Ordinance.

B. The definition of family shall not include activities that require treatment regularly performed on the premises and shall not include uses which meet the definition of "boardinghouse," "dormitory," "motel" or "hotel," or "treatment center." This definition shall not include housing persons released from or under the jurisdiction of a government Bureau of Corrections or similar institution. (Borough of North Wales Ordinance No. 796 § 208-8, ECF No. 42 Ex. F.)

11. The Zoning Ordinance defines "functional family equivalent" as "[p]ersons living and cooking together as a single, nonprofit and non-transient housekeeping unit and having facilities to do their cooking on the premises." (Borough of North Wales Ordinance No. 796 § 208-8, ECF No. 42 Ex. F.)

12. The Zoning Ordinance defines "special exception" as:

A use which may be granted or denied pursuant to express standards or criteria by the Zoning Hearing Board in accordance with Article XXII hereof where provisions therefore are made by the terms of this chapter. In granting a special exception, the Zoning Hearing Board may attach such reasonable conditions and safeguards as it may deem necessary to implement the purposes of this chapter. (Borough of North Wales Ordinance No. 796 § 208-8, ECF No. 42 Ex. F.)

13. The Zoning Ordinance does not define the terms "nonprofit" or "transient." (Borough of North Wales Ordinance No. 796 § 208-8, ECF No. 42 Ex. F.)

C. The Application for a Special Exception

14. Sometime in May of 2015, Mr. Bartlet applied for, and was granted, a certificate of occupancy for "up to three unrelated persons" from the Borough. The certificate of occupancy did not provide permission to operate a recovery house. (Douglas Dep. 10/12/17 at 100:4–21, ECF No. 42 Ex. C; N.T. 9/1/15 at 128:18–21, ECF No. 42, Ex. D; Borough Certificate of Occupancy 5/28/15, ECF No. 42, Ex. Q.)

15. Mr. Douglas informed the Borough that SOS House was intended to be used as a home for people recovering from addiction, and specified that the number of residents was to be between three and ten men. With this knowledge, the Borough provided a certificate of occupancy for three unrelated individuals, and advised that SOS House would have to apply for a special exception to house more than three unrelated individuals. (Bartlet Dep. 10/12/17 at 32:2–36:17, ECF No. 42 Ex. B;

Douglas Dep. 10/12/17 at 100:4–21, ECF No. 42 Ex. C; N.T. 9/1/15 at 32:2–34:9, ECF No. 42, Ex. D; Borough Letter 5/20/15, ECF No. 42, Ex. U.)

16. On July 31, 2015, SOS House's attorney, Edward Hughes submitted an application to the ZHB on behalf of SOS House for a special exception as to the definition of a family to permit occupancy of up to ten residents. (ZHB Application 7/31/15, ECF No. 42, Ex. E.)

17. During a Borough Council Meeting on August 11, 2015, Borough Member Hart advised that the hearing was scheduled for September 1, 2015 to rule on SOS House's application for a special exception. (Borough Council Meeting Minutes 8/11/15 at 2, ECF No. 45, Ex. 12.)

18. During the Borough Council Meeting on August 25, 2015, Borough Member Hart again advised that the hearing was scheduled for September 1, 2015. Mel Magee, the neighbor owning the other half of the twin home, advised that SOS House posted information about the Property, which stated that the Property was empty. However, Ms. Magee advised that the Property was currently occupied. Another neighbor expressed concerns about having ten people live in one house. (Borough Council Meeting Minutes 8/25/15 at 2, ECF No. 45, Ex. 13.)

19. Mr. Daniel O'Connell, Sr. was a member of the Borough Council for various terms between 1984 and 2016. (O'Connell Dep. 2/16/18 at 6:18–10:8, ECF No. 42, Ex. L.) During the Borough Council Meeting on August 11, 2015, the SOS House Application was discussed, wherein Mr. O'Connell recommended that the Borough Solicitor should attend the ZHB Hearing. (Id. at 34:4–36:19.) During this meeting, the Borough voted to oppose SOS House's application, based on the concern about the number of residents, "what would be going on in the house," and whether the house was legally occupied. (Id. at 36:20–40:8.) Mr. O'Connell recalled that there were public objections during this Borough Council meeting. (Id. at 39:11–40:8.)

20. Mayor Gregory D'Angelo was the Mayor of the Borough at all relevant times, and explained in his deposition that the Borough Council opposed Plaintiffs' Application because of concerns that Plaintiffs could not satisfy the requirements of a family, particularly the "non-transient" requirement. (D'Angelo Dep. 2/16/18 at 15:18–16:7, ECF No. 42, Ex. M.)

21. During his deposition, Mr. James Sando testified that he was a Borough Council member at all relevant times, and had been interviewed by the newspapers in June of 2015 about neighbor concerns regarding the SOS House's Application for a Special Exception. (Sando Dep. 2/16/18 at 6:12–7:13, 9:19–11:11, ECF No. 45, Ex. 6.) He also confirmed that the Borough had hired special counsel so that someone would be familiar with this specific zoning issue. (Id. at 15:15-16:15.)

**D. The ZHB Hearings on September 1, 2015 and October 6, 2015**

22. On September 1, 2015, the ZHB held a hearing regarding SOS House's Application for a Special Exception. Due to the length of the hearing, it was continued on October 6, 2015. (N.T. 9/1/15 at 209:1–7, ECF No. 42, Ex. D; N.T. 10/6/15, ECF No. 42, Ex. H.)

23. The Borough Solicitor stated during the September 1, 2015 Hearing that all applications for zoning relief are treated separately and that no ZHB decision has precedential value. (N.T. 10/6/15 at 168:11–25, ECF No. 42, Ex. H.)

24. During the September 1, 2015 Hearing, Mr. Bartlet explained to the ZHB that he was the landlord of the Property and rented the Property to SOS House. Mr. Bartlet provided the ZHB with a copy of the lease, which was unsigned, did not have an amount listed in the monthly rent provision, and included irrelevant provisions regarding auto body work and spray work. When the ZHB questioned Mr. Bartlet about these matters, he explained that this lease was copied from a previously used and unrelated lease. He advised that there would be some modifications to the lease, but these changes would not be "substantial." Mr. Bartlet explained that the monthly rent amount was blank because it had not yet been determined. (N.T. 9/1/15 at 18:21–21:24, 62:1–64:25, 115:13–25, ECF No. 42, Ex. D; Lease Agreement, ECF No. 42, Ex. G.) During the October 6, 2015 Hearing, Plaintiffs provided the ZHB with the revised signed lease, which stated that the monthly rent was $2,200 and contained revised home rules that the residents would be required to follow. (N.T. 10/6/15 at 9:11–25, ECF No. 42, Ex. H.)

25. Mr. Bartlet advised the ZHB during the September 1, 2015 Hearing that SOS House was seeking a special exception to permit ten people to live in the Property, which he argued was a reasonable accommodation because the individuals needed such support and a greater sense of community. (N.T. 9/1/15 at 30:5–7, 69:6–24, ECF No. 42, Ex. D.)

26. During the September 1, 2015 and October 6, 2015 Hearings, Mr. Bartlet advised that SOS House did not have liability insurance at the time of the September 1, 2015 Hearing, but that they were in the process of obtaining such insurance. Mr. Douglas testified that SOS House did not have liability insurance because they needed to be at full capacity to afford it. However, Mr. Douglas admitted that he had not looked into the cost of liability insurance. (N.T. 9/1/15 at 117:5–119:19, 130:14–134:24, 34:10–36:25, ECF No. 42, Ex. D; N.T. 10/6/15 at 16:9–18:7, ECF No. 42, Ex. H.)

27. During the ZHB Hearings, the topic of whether it was "necessary" for SOS House to have ten residents was discussed extensively.

    – When the ZHB members asked Mr. Bartlet and Mr. Douglas if SOS House needed ten people to provide the necessary support, Mr. Bartlet and Mr. Douglas advised that based on their knowledge and experience a lower

number was not practical. (N.T. 9/1/15 at 152:20–25, ECF No. 42, Ex. D.) While Mr. Bartlet did not have professional qualifications to support this position, he argued that he had the practical experience to run this home because he had lived in a recovery home as a recovering addict. (N.T. 9/1/15 at 74:7–76:10, ECF No. 42, Ex. D.)

− Mr. Douglas testified at the hearing that they were breaking even on the property with three residents living there. (N.T. 10/6/15 at 18:5–10, ECF No. 42, Ex. H.)

− Ms. Nina Aniskevich testified during the October 6, 2015 Hearing as an expert in the benefits of sober homes and the referral/placement process. She opined that sober homes were critical for recovery and that a sober house needed at least eight people to be successful. (N.T. 10/6/15 at 41:23–25, 69:14–17, ECF No. 42, Ex. H.)

− Several residents of SOS House stated that the home was critical to their recovery, and commented on the importance of having a community environment. (N.T. 10/6/15 at 93:3–95:6, ECF No. 42, Ex. H; Aff. John Ciminelli, ECF No. 45, Ex. 8; Aff. John Founds, ECF No. 45, Ex. 9; Aff. Fred Way, ECF No. 45, Ex. 10.)

− Mr. Robert Bedford testified at the October 6, 2015 Hearing as an expert in the area of the effectiveness and benefits of sober houses. (N.T. 10/6/15 at 126:4–130:13, ECF No. 42, Ex. H.) Specifically, Mr. Bedford described the benefits of the sober home, specifically the benefit of living in a community/family environment, which he opined is "optimal" with seven to ten people. (Id. at 130:17–25, 134:8–135:8.) Mr. Bedford also explained that the average stay is between eight to ten months, sometimes up to a year and a half. (Id. at 132:1–23.) Mr. Bedford also explained that SOS House was seeking accreditation from the Pennsylvania Alliance of Recovery Residences ("PARR"), which is an accreditation organization that ensures compliance of standards for recovery houses: "It's probably the top accreditation you can get in the United States currently." (Id. at 132:24–134:7.) Mr. Bedford also stated that drug and alcohol abuse is recognized as a disability under federal law. (Id. at 135:9–20.)

− Some residents spoke in favor of the special exception. (N.T. 10/6/15 at 169:1–170:21, ECF No. 42, Ex. H.)

28. During the Hearings, the issue of whether there was sufficient living space in the Property for ten adult males was also raised.

− The ZHB members expressed concerns that the size of the home would not be adequate for ten adult males. (N.T. 9/1/15 at 48:2–22, 57:4–58:14, 65:8–67:10, ECF No. 42, Ex. D.)

– Mr. Joseph Zadlo testified during the September 1, 2015 Hearing as an expert in residential planning. He opined there was adequate living space in the Property for ten residents. However, he advised that he had not reviewed the exact room dimensions. (N.T. 9/1/15 at 175:17–25, ECF No. 42, Ex. D.)

– Ms. Nina Aniskevich testified during the October 6, 2015 Hearing as an expert in the benefits of sober homes and the referral/placement process. She opined that the home was operating well with three people, and there was no reason to think it would not work with ten people. Ms. Aniskevich admitted that she had not seen the property as of the date of the hearing. (N.T. 10/6/15 at 41:23–25, 60:23–62:21, ECF No. 42, Ex. H.)

– During the October 6, 2015 Hearing, neighbors also raised concerns that ten residents were too many for the Property. (N.T. 10/6/15 at 169:1–6, ECF No. 42, Ex. H.)

29. The question of whether there was sufficient parking available was also discussed during the Hearings.

– The ZHB expressed concerns about adequate parking for ten people. Mr. Bartlet acknowledged that it was possible that all ten residents could have a vehicle as it was permitted for all residents to have a vehicle. However, Mr. Bartlet further explained that it was highly unlikely that all ten individuals would need parking, given the proximity of the Property to public transportation. Mr. Bartlet also advised that he could add a limitation to the rules that would permit only up to two residents to have a car on the Property. (N.T. 9/1/15 at 117:5–119:19, 130:14–134:24, 34:10–36:25, ECF No. 42, Ex. D.)

– The neighbor residents also complained about the current lack of parking on the street. (N.T. 9/1/15 at 165:21–167:21, ECF No. 42, Ex. D.)

– Mr. Joseph Zadlo testified during the Hearing on September 1, 2015 as an expert in residential planning. He opined that ten additional cars would strain the neighborhood's parking. (N.T. 9/1/15 at 190:17–191:3, 199:17–25, ECF No. 42, Ex. D.)

30. During the ZHB Hearings, the issue of the short amount of time that the residents would live at the Property (i.e., the "transience" of the residents) was also discussed.

– Mr. Bartlet explained that the residents can live at SOS House for any duration of time, so long as they abide by the house rules. Mr. Bartlet did not provide these rules to the ZHB at the Hearings. (N.T. 9/1/15 at 104:25–105:2, 109:24–111:10, ECF No. 42, Ex. D.)

– Mr. Douglas explained that the sober home began operating in May of 2015 within the three person limitation. Between May and September 1, 2015, Mr. Douglas advised that eight different residents had lived in the Property, due to turnover. (N.T. 9/1/15 at 123:17–125:24, ECF No. 42, Ex. D.)

– Mr. Douglas also admitted that there had been further turnover between September 1, 2015 and October 6, 2015. (N.T. 10/6/15 at 29:22–25, ECF No. 42, Ex. H.)

– Ms. Nina Aniskevich testified during the Hearing on October 6, 2015 as an expert in the benefits of sober homes and the referral/placement process. She opined that she did not know the average length of stay for residents. (N.T. 10/6/15 at 41:23–25, 64:25–65:21, ECF No. 42, Ex. H.)

– During the October 6, 2015 Hearing, Mr. Angelo Delgrippo testified as one of the residents of SOS House and the house manager. He stated that he had asked five people to leave between June of 2015 to the October 6, 2015 hearing due to a variety of reasons, including failing to do chores and using drugs or alcohol. (N.T. 10/6/15 at 105:9–112:25, ECF No. 42, Ex. H.)

31. During the Hearings, the ZHB members expressed concern over whether SOS House was a nonprofit organization, given that Mr. Douglas claimed that he and Mr. Bartlet were earning "equity" in the Property. It was also unclear whether Mr. Bartlet and Mr. Douglas were planning to be paid salaries at any point. (N.T. 9/1/15 at 140:25–143:13, ECF No. 42, Ex. D.) The ZHB expressed concerns that Mr. Bartlet did not have plans for the money after the Property's mortgage was paid. (N.T. 10/6/15 at 173:22–174:13, ECF No. 42, Ex. H.)

32. Significant neighbor opposition and concerns were presented during the Hearings.

– The neighbor opposition parties were permitted to speak, so long as the individual provided the testimony under oath. (N.T. 9/1/15 at 144:7–16, 151:23–152:6, 158:1–25, 166:1–25, ECF No. 42, Ex. D; Kratowicz Dep. 2/16/18 at 43:7–44:3, ECF No. 42, Ex. P; Berenson Dep. 2/16/18 at 41:21–48:11, ECF No. 42, Ex. N.)

– While one resident attempted to present a petition in opposition to SOS House's Application, the ZHB did not accept this petition because the individuals who had signed the petition would all need to be sworn in, testify, and be cross-examined. (N.T. 10/6/15 at 187:13–190:19, ECF No. 42, Ex. H.)

– The neighbors expressed concerns regarding the individuals, based on their alcoholism and drug addiction (i.e., their disability). Specifically, one neighbor stated: "I do think it's great what you guys are doing. I just don't

9

want it in the neighborhood." Another neighbor echoed this sentiment by stating that Plaintiffs had not established that this type of home was needed or wanted by this community and neighborhood. (N.T. 10/6/15 at 166:20–167:15,195:17–199:13 ECF No. 42, Ex. H.)

– Other neighbors expressed concerns about the impact of this type of home on children's safety: "If I'm living in a community where halfway houses are popping up, call me prejudice, call me a jerk, call me a bad person. I don't care. I got three young kids. It's bad enough out there. I'm trying to find the best damned neighborhood that I can, and I pay good tax dollars to do that, and I put my kids before anyone." (Id. at 23:2–28:14, 194:12–195:9, 184:7–12, 191:7–194:4.)

– Neighbors further expressed concerns on the impact of this type of home on property values. (Id. 54:19–60:14; 165:5–19.)

## E. The November 16, 2015 ZHB Decision and Order

33. At the conclusion of the October 6, 2015 Hearing, the ZHB denied Plaintiffs' application "on the grounds that it does not meet the burden of proof in 208-191-A, and specifically, it does not meet the definition in 208-8 family, Subsection A, Subsection 4, and for the reasons that the use is transient and does not meet the definition of a not for profit. With respect to 208-191-A, Subsection 2, it's contrary to the public interest, in that it's detrimental to the appropriate use of the adjacent property, and it causes undue congestion of pedestrian and vehicular traffic." (N.T. 10/6/15 at 226:21–227:25, ECF No. 42, Ex. H.)

34. On November 16, 2015, the ZHB issued a written "Decision and Order," wherein the ZHB found the following:

79. The Zoning Hearing Board finds that the tenants' stay at the Property is transient in nature.

80. The Zoning Hearing Board finds that the Applicant did not meet its burden to prove that it complies with all of the specific and objective criteria set forth in (4) of the definition of Family, including that the Applicant has adequate off-street parking facilities.

81. The Zoning Hearing Board finds that the Applicant did not meet its burden to prove that it complies with all of the specific and objective criteria set forth in A(4) of the definition of Family, including that the Applicant is operating as a single nonprofit housekeeping unit.

82. The Zoning Hearing Board finds that the Applicant did not meet its burden to prove that it complies with all of the specific and objective criteria set forth in (4) of the definition of Family, including that the Applicant is operating as a non-transient housekeeping unit.

83. The Zoning Hearing Board finds that the Applicant did not meet its burden of proof as required by Section 208-191 of the Zoning Ordinance as the allowance of the special exception will be contrary to the public interest.

84. Several of the Neighbor Parties and other North Wales residents and neighbors of the Property testified as to their opposition to the Application testifying that the proposed use was not compatible with the residential neighborhood.

85. The Zoning Hearing Board finds that the Neighbor Parties opposed to the Applicant met their duty and burden to prove that the proposed use will be injurious to the public health, safety and welfare.

86. The Zoning Hearing Board finds that the proposed use will be detrimental and/or injurious to the adjacent property and the neighborhood and will cause undue congestion of vehicular traffic." (ZHB Order and Decision 11/16/15 ¶¶ 79–86, ECF No. 45, Ex. 4.)

35. Mr. Andrew Berenson was a ZHB member during the 2015 Hearings. (Berenson Dep. 2/16/18 at 9:23–15:9, ECF No. 45, Ex. N.) At his deposition, he stated that there were complaints made during the Hearings and that, because "North Wales is a small borough, the philosophy of the zoning hearing board is that we'll let the residents get their say." (Id. at 41:21–42:22.)

36. Mr. Berenson also stated during his deposition that he did not remember the specific line of complaints by the public, other than concerns about traffic and "an issue of people coming and going for the nature of the sobriety house, whether it was your applicants who were checking in on them or whether it was any other professionals who were coming and going." (Id. at 42:24–46:19.)

37. When asked during his deposition what the ZHB relied upon to make its determination, Mr. Berenson explained:

> I don't recall specifics because it was over two years ago. I do recall that – and this is what I relied on – the testimony that the applicants gave when they testified, any of their people testifying on their behalf. And I do remember at least there was

one woman who testified on their behalf. And, also, I relied on was the exhibits that was presented, as well as public comment. And public comment could either be questions or testimony wherein the public was sworn in . . . And that is typically what I always rely on when I make a determination." (Berenson Dep. 2/16/18 at 66:1568:8, ECF No. 45, Ex. N.)

38. When asked during his deposition about the condition that Mr. Bartlet would impose to limit the number of cars at the property, Mr. Berenson said that the concern was not just about the residents but the visitors. (Id. at 74:7–75:22.) He also advised that the Borough can limit visitor parking for a particular household "in some instances," such as a business, but explained that he could not recall the exact requirements of the Zoning Ordinance. (Id. at 75:23–79:1.) Because SOS House stated that they needed ten residents, "the Board felt that ten was not a reasonable accommodation." (Id. at 85:9–86:22.) Mr. Berenson further explained that the ZHB found that the proposed use would be injurious to the public health, safety, and welfare because of traffic: "the applicants had testified that there would be people coming and going. That the residents would still need to have jobs. So they may still need vehicles." (Id. at 86:23–88:15.) When asked what specific evidence was relied upon by the ZHB to determine the traffic issue, Mr. Berenson advised that he did not recall any specific testimony. (Id. at 88:16–89:22.) Mr. Berenson's reason for not considering the accommodation in light of Mr. Bartlet's acceptance of a condition to limit the number of cars was: "just because [Mr. Bartlet] said he would limit the number of cars doesn't mean he would be able to." (Id. at 89:19–22.) Mr. Berenson could not point to any specific facts that the Application posed a public safety issue except "that the residents and public comment provided opinions[, a]nd it was [the neighbors'] opinion that if there were 10 people living there, there would be too many cars." (Id. at 90:18–93:12.)

39. When Mr. Berenson was asked during his deposition whether the "Board made its decision based on opinions that were rendered by the public," he testified that "[t]his is part of the –as I interpret the burden of proof on the zoning hearing body of our – of what we consider, we can consider certain factors, and that is one of the factors that can be considered." (Id. at 93:14–22.) He also stated that the "transient" nature of the residents was a factor. (Id. at 96:10–19.)

40. Mr. Michael Kratowicz was a ZHB member when SOS House applied for the special exception. (Kratowicz Dep. 2/16/18 at 7:15–23, ECF No. 42, Ex. P.) He explained during his deposition that there was discussion of a reasonable accommodation. (Id. at 15:3–21.) He further explained that the ZHB had never considered a special exception to waive the number of unrelated persons, or family equivalent, or groups of disabled persons. (Id. at 19:5–24.) He recalled only one other time when the Borough had hired counsel for a proceeding, which was when a developer wanted to build a hotel across the street from a SEPTA station. (Id. at 22:8–23:1.)

41. During his deposition, Mr. Kratowicz also testified that his job as Chairman was to ensure that the hearings proceeded efficiently, and to permit everyone to have the opportunity to speak. (Id. at 30:15–31:10.) He stated that one of the reasons for denying the application was because of the parking concern,. He explained that Mr. Bartlet's offer to limit the amount of cars was not sufficient because Mr. Kratowicz was "not so sure how he could agree or guarantee that there were only four cars within the property." (Id. at 37:8–41:24.) Mr. Kratowicz stated that he did not rely on the statements of the audience regarding the parking, but could not speak for the other ZHB members. (Id. at 43:9–44:2.) He also explained that there were opposing opinions by the neighbors, but that he could not remember the specific facts. When pushed on this question, he explained that the opposition revolved around the parking concerns and that the "transience" would cause too much stress on the community. (Id. at 55:21–63:11.)

## F. The January 26, 2016 Notice and Subsequent Discovery

42. On January 26, 2016, the Borough sent a letter to Plaintiffs to alert them that they had violated the Zoning Ordinance because they had more than three individuals occupying the residence. (Violation Letter 1/26/16, ECF No. 42, Ex. V.)

43. Defendants conducted a parking study in March of 2018, which concluded that, given the proposal for a home with ten adults within the facility, "[t]he intensity for trip generation and parking demand is likely to exceed that predicated in this analysis." (North Wales Parking Study 3/13/18 at 5, ECF No. 42, Ex. R.)

44. Dr. William Santoro, an expert in drug and alcohol addiction, stated that a sober house can operate with three people, but five to eight residents is optimal, as a home with too many residents can cause factions. (Santoro FRCP 26 Statement 3/13/15 at 1–2, ECF No. 42, Ex. S.)

45. Mr. Brian Duffy submitted a Rule 26 Statement, concluding that SOS House was a for-profit entity that afforded financial benefits to its officers in a way that was inconsistent with the restrictions of a nonprofit corporation in Pennsylvania. (Duffy FRCP 26 Statement 3/13/15 at 11, ECF No. 42, Ex. T.)

46. Mr. Fred Way, the executive director of PARR., explained in his Affidavit that SOS House was PARR certified on April 10, 2017. Additionally, Mr. Way explained that PARR does not certify houses that are overcrowded. Mr. Way further explained that the smallest certified house is four residents, and the average is between twelve to eighteen. However, Mr. Way opined that the optimal benefit is realized with homes that have between eight and twelve residents. (Aff. Way 5/21/18 ¶¶ 7, 10, 13, 15, ECF No. 45, Ex. 11.)

### III.    LEGAL STANDARDS

#### A.  Summary Judgment Standard

Under Federal Rule of Civil Procedure 56(a), summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  A dispute is "genuine" if there is a sufficient evidentiary basis on which a reasonable factfinder could return a verdict for the non-moving party, and a factual dispute is "material" if it might affect the outcome of the case under governing law.  Kaucher v. Cnty. of Bucks, 455 F.3d 418, 423 (3d Cir. 2006) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)).  The court must view the evidence in the light most favorable to the non-moving party.  Galena v. Leone, 638 F.3d 186, 196 (3d Cir. 2011).  However, "unsupported assertions, conclusory allegations or mere suspicions" are insufficient to overcome a motion for summary judgment.  Schaar v. Lehigh Valley Health Servs., Inc., 732 F. Supp. 2d 490, 493 (E.D. Pa. 2010) (citing Williams v. Borough of W. Chester, Pa., 891 F.2d 458, 461 (3d Cir. 1989)).

The movant "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact."  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  Where the non-moving party bears the burden of proof on a particular issue at trial, the moving party's initial Celotex burden can be met by showing that the non-moving party has "fail[ed] to make a showing sufficient to establish the existence of an element essential to that party's case."  Id. at 322.

After the moving party has met its initial burden, summary judgment is appropriate if the non-moving party fails to rebut the moving party's claim by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or

declarations, stipulations . . . , admissions, interrogatory answers, or other materials" that show a genuine issue of material fact or by "showing that the materials cited do not establish the absence or presence of a genuine dispute." FED. R. CIV. P. 56(c)(1)(A).

## B. General Legal Standards of Discrimination Under the FHA and ADA

The FHA prohibits discrimination in the sale or rental of housing on the basis of race, color, religion, sex, disability,[1] familial status, or national origin. 42 U.S.C. § 3604(f)(2); Revock v. Cowpet Bay W. Condo. Ass'n, 853 F.3d 96, 110 (3d Cir. 2017).[2] The FHA defines a "handicap" as: "(1) a physical or mental impairment which substantially limits one or more of such person's major life activities, (2) a record of having such an impairment, or (3) being regarded as having such an impairment, but such term does not include current, illegal use of or addiction to a controlled substance." 42 U.S.C. § 3206(h); Cmty. Servs., Inc. v. Wind Gap Mun. Auth., 421 F.3d 170, 179 (3d Cir. 2005).

Drug addiction and alcoholism are both recognized as potential handicaps under the FHA where the addiction substantially limits a major life activity. The pertinent FHA regulations clarify that "[t]he term physical or mental impairment includes, but is not limited to, . . . drug addiction

---

[1]     Though the FHA uses the term "handicap," I will use the term "disability" throughout this opinion for sake of consistency with my analysis of Plaintiffs' ADA claim. There is no substantive difference between the two terms. See McKivitz v. Township of Stowe, 769 F.Supp.2d 803, 821 (W.D. Pa. 2010) ("Courts generally consider individuals deemed to be 'handicapped' within the meaning under the FHA to likewise be 'disabled' within the meaning of the [] ADA.")

[2]     As for Plaintiffs' claim under the ADA, Title II of that statute, which prohibits discrimination by public entities on the basis of disability, also applies to zoning decisions, and places upon governments an affirmative duty to make accommodations in order to afford disabled persons with the same housing opportunities as the non-disabled, so long as those accommodations are reasonable and do not place an undue financial or administrative burden on the municipality or require a fundamental alteration in the nature of the program. Tsombanidis v. City of West Haven, 129 F.Supp.2d 262, 291-92 (D. Conn. 2001). Being that these requirements are essentially the same as the FHA reasonable accommodations standard, I will discuss Plaintiffs' FHA and ADA reasonable accommodations claim together.

(other than addiction caused by current, illegal use of a controlled substance) and alcoholism." 24 C.F.R. § 100.201.  "Recovering alcoholics and drug addicts can sometimes qualify as handicapped individuals under the FHA, provided that they are not currently using illegal drugs."  McKivitz v. Twp. of Stowe, 769 F. Supp. 2d 803, 823 (W.D. Pa. 2010) (quoting Lakeside Resort Enterprises, LP v. Bd. of Sup'rs of Palmyra Twp., 455 F.3d 154, 156 n.5 (3d Cir. 2006)); Oxford Investments, L.P. v. City of Philadelphia, 21 F. Supp. 3d 442, 454 (E.D. Pa. 2014).

"[D]iscrimination includes . . . a refusal to make reasonable accommodations in rules, policies, practices, or services, when such accommodations may be necessary to afford such person equal opportunity to use and enjoy a dwelling."  McKivitz, 769 F. Supp. 2d at 823 (quoting 42 U.S.C. § 3604(f)(3)(B)).  Statutory claims brought against zoning authorities under the FHA and the Americans with Disabilities Act may proceed under the "intentional discrimination," "disparate impact" or "reasonable accommodation" theories.  Id.  Plaintiffs allege violations pursuant to the "intentional discrimination" and "reasonable accommodation" theories.

## IV.    DISCUSSION AND ANALYSIS

Both Plaintiffs and Defendants move for summary judgment as to the Intentional Discrimination Claim (Count One) and the Reasonable Accommodation Claim (Count Two).  For the reasons discussed below, I conclude that genuine issues of material fact exist as to both claims.

### A.  The Intentional Discrimination Claim

Both parties urge that the undisputed facts justify judgment as matter of law in their favor. Plaintiffs argue that the ZHB and the Borough had a duty to put aside the impermissible prejudices of those in opposition to Plaintiffs' Application for a Special Exception, and that the undisputed facts reflect that Defendants were instead influenced by these prejudices.  Defendants respond that Plaintiffs' Application was denied for legitimate, non-discriminatory reasons because Plaintiffs

failed to establish that they complied with the specific and objective criteria in the Zoning Ordinance, including that SOS House had adequate off-street parking facilities, was a nonprofit housekeeping unit, and was a non-transient unit. Defendants also point out that the Neighbor Parties opposed to the Applicant met their duty to prove that the use would be injurious to the public health, safety, and welfare, and that the proposed use was injurious to the neighborhood and would cause undue congestion of vehicular traffic.

To prevail on an intentional discrimination claim under the FHA, a plaintiff is required only to show that the disability was a "motivating factor" in the adverse decision. Cmty. Servs., Inc. v. Wind Gap Mun. Auth., 421 F.3d 170, 177 (3d Cir. 2005). "In order to prove intentional discrimination it is not necessary to show an evil or hostile motive. It is a violation of the FHA to discriminate even if the motive was benign or paternalistic." Id. (quoting Horizon House Developmental Servs., Inc. v. Twp. of Upper Southampton, 804 F. Supp. 683, 696 (E.D. Pa. 1992), aff'd, 995 F.2d 217 (3d Cir. 1993)). "The plaintiff is only required to 'show that a protected characteristic played a role in the defendant's decision to treat her differently.'" Id. (citing Cmty. Hous. Tr. v. Dep't of Consumer & Regulatory Affairs, 257 F. Supp. 2d 208, 225 (D.D.C. 2003)). A plaintiff may demonstrate a violation of the FHA if he can show that "discriminatory governmental actions are taken in response to significant community bias." Tsombanidis v. City of West Haven, Conn., 129 F.Supp.2d 136, 152 (D. Conn. 2001).

"[A] decision made in the context of strong, discriminatory opposition becomes tainted with discriminatory intent even if the decision-makers personally have no strong views on the matter." Innovative Health, 117 F.3d at 49. "Discriminatory intent may be established where animus towards a protected group is a significant factor in the community opposition to which the commissioners are responding." United States v. Borough of Audubon, N.J., 797 F. Supp. 353,

361 (D.N.J. 1991), aff'd, 968 F.2d 14 (3d Cir. 1992) (finding that there was intentional discrimination where the "officials stated that they agreed with or were responding directly to community opposition which was clearly discriminatory").

Both parties point to facts of record which they urge justify the grant of their motion as to the intentional discrimination claim. But, as set forth below, the record contains facts favorable to both sides which, if accepted by a factfinder, could justify a verdict for either party.

**Plaintiffs' Evidence**

The following facts, if accepted, could allow a reasonable factfinder to find that the application's denial was discriminatory: First, there was significant opposition to the Application based on the residents' disability (i.e., alcohol and drug addiction). For example, one neighbor stated: "I do think it's great what you guys are doing. I just don't want it in the neighborhood." Another neighbor echoed the sentiment as it related to his children: "If I'm living in a community where halfway houses are popping up, call me prejudice, call me a jerk, call me a bad person. I don't care. I got three young kids. It's bad enough out there." (See supra ¶ 32.)

Second, the Decision and Order issued by the ZHB provided several reasons for denying the Application, some of which could be viewed by a factfinder as improper. For example, one of the stated reasons for the denial was that "[s]everal of the Neighbor Parties and other North Wales residents and neighbors of the Property testified as to their opposition to the Application testifying that the proposed use was not compatible with the residential neighborhood." (See supra ¶ 34.) Another stated reason for the application's denial was that "the Neighbor Parties opposed to the Applicant met their duty and burden to prove that the proposed use will be injurious to the public health, safety and welfare." (See supra ¶ 34.) While neither of these reasons explicitly cite alcoholism or drug dependence, both directly reference the neighbor comments that explicitly cite

these handicaps. Thus, when read in conjunction with the entire record, a factfinder could find these stated reasons to be discriminatory.

The ZHB further found that "the proposed use will be detrimental and/or injurious to the adjacent property and the neighborhood and will cause undue congestion of vehicular traffic." (See supra ¶ 34.) While this stated reason does contain a legitimate non-discriminatory factor (i.e., parking), the Residents' testimony could also establish a discriminatory basis for the application's denial, upon which the ZHB relied. Indeed, the ZHB members stated during their depositions that the public opinions heard during the Hearings was a factor considered. (See supra ¶¶ 37, 39–41.)

In short, viewed in a light most favorable to Plaintiffs, a reasonable factfinder could conclude that the application's denial was discriminatory.

**Defendants' Evidence**

The following facts, if accepted, could also allow a reasonable factfinder to find that the application's denial was not discriminatory. First, the Property was located in the "R-C Residential" zoning district of the Borough, which restricted the number of unrelated occupants in a residence to three, and Plaintiffs were granted a certificate of occupancy for up to three unrelated persons in May of 2015. (See supra ¶¶ 6, 9–10, 14.) The Zoning Ordinance required Plaintiffs to apply for a "special exception" to use the Property as Plaintiffs intended, and Plaintiffs had to satisfy these requirements. (See supra ¶¶ 10–12, 15.) The Decision and Order provided several reasons for denying the Application, including that "the Applicant did not meet its burden to prove that it complies with all of the specific and objective criteria set forth in (4) of definition of Family, including that the Applicant has adequate off-street parking facilities." (See supra ¶ 34.)

Moreover, the neighbor parties opposed the Application for a variety of non-discriminatory reasons, such as their concern that permitting ten adult men to reside at the Property would put too much strain on the Property, and create traffic and parking problems. (See supra ¶¶ 28–30.)

Because Plaintiffs must only establish that the disability was a "motivating factor" in the adverse decision to prevail on an intentional discrimination claim, the ultimate question here is whether the ZHB relied upon the discriminatory comments and animus in their decision. See Cmty. Servs., Inc. v. Wind Gap Mun. Auth., 421 F.3d 170, 177 (3d Cir. 2005). This is an outstanding question of fact. Given the existence of disputed material facts, I find that none of the parties are entitled to summary judgment as to the Intentional Discrimination Claim.

## B. The Reasonable Accommodation Claim

Plaintiffs assert that the ZHB did not properly consider the request for a reasonable accommodation to be treated as a family, given that the ZHB could have waived or modified the conditions needed to be met to be deemed a "functional family equivalent." Specifically, Plaintiffs argue that they satisfactorily established the necessity for the home by introducing expert testimony at the Hearings, and that Defendants failed to show that a modification would have been unreasonable, in light of Plaintiffs' offer to limit parking needs by the residents. Defendants respond that Plaintiffs have failed to establish that the accommodation was necessary to afford the residents an equal opportunity to use or enjoy the property, and that the ZHB did consider the request by Plaintiffs as it related to the special exception under the definition of a family, but found it was unreasonable due to parking restrictions. For the reasons set forth below, I will deny all of the parties' motions for summary judgment as to the Reasonable Accommodation Claim.

The Third Circuit employs "a burden-shifting analysis in which the initial burden is on the plaintiff to demonstrate that the accommodations that it requested are 'necessary to afford

[disabled] persons [an] equal opportunity to use and enjoy a dwelling,' at which point the burden shifts to the defendant to show that the requested accommodations are unreasonable." Lapid-Laurel, L.L.C. v. Zoning Board of Adjustment of the Township of Scotch Plains, 284 F.3d 442, 457–58 (3d Cir. 2002) (quoting 42 U.S.C. § 3604 (f)(3)(B)) ("While a plaintiff is in the best position to show what is necessary to afford its clients . . . an equal opportunity to use and enjoy housing, a defendant municipality is in the best position to provide evidence concerning what is reasonable or unreasonable within the context of its zoning scheme."). In order to grant summary judgment, a court "must determine whether there is a genuine issue of material fact regarding: (1) whether the accommodations that [the plaintiff] requested were necessary to afford handicapped persons an equal opportunity to use and enjoy housing; and, if so (2) whether the accommodations requested were unreasonable." Id. at 459.

In order to satisfy the initial burden under § 3604(f)(3)(B), "a plaintiff must, at a minimum, demonstrate that the proposed accommodations will 'affirmatively enhance' a handicapped person's quality of life 'by ameliorating the effects of [his or her] disability.'" McKivitz v. Twp. of Stowe, 769 F. Supp. 2d 803, 824 (W.D. Pa. 2010) (quoting Bronk v. Ineichen, 54 F.3d 425, 429 (7th Cir. 1995)). In order to shift the burden of proving "unreasonableness" to Defendants, "Plaintiffs must establish a nexus between the proposed accommodations and their necessity for providing handicapped individuals with an equal opportunity to live in a residential area." Id. It is insufficient "to show that the proposed accommodations are needed to enable handicapped individuals to live in a specific facility located within a particular residential district." Id. (emphasis in original).

When the burden shifts to the defendant "to establish that the accommodation proffered by the applicant was not reasonable, the municipality is required to prove that it could not have

granted the variance without: (1) imposing undue financial and administrative burden; (2) imposing an undue hardship upon the township; or (3) requiring a fundamental alteration in the nature in the zoning program." Lapid-Laurel, 284 F.3d at 462 (internal quotations and alterations omitted). The Third Circuit has "cautioned that this inquiry is highly fact-specific, requiring a case-by-case determination." Id. (internal quotations omitted).

Here, none of the parties are entitled to summary judgment as to the Reasonable Accommodation Claim under the FHA or ADA because there are genuine issues of material fact as to whether Plaintiffs have satisfied the factual burden of necessity and whether Defendants have demonstrated the unreasonableness of Plaintiffs' accommodation request.

**Plaintiffs' Demonstration of "Necessity"**

The burden lies with Plaintiffs to establish that the requested accommodation for ten residents will "'affirmatively enhance' a handicapped person's quality of life 'by ameliorating the effects of [his or her] disability.'" McKivitz v. Twp. of Stowe, 769 F. Supp. 2d 803, 824 (W.D. Pa. 2010) (quoting Bronk v. Ineichen, 54 F.3d 425, 429 (7th Cir. 1995)). Plaintiffs argued both during the ZHB Hearings and here that the accommodation for ten people was necessary by offering the testimony of SOS House's owners, experts, and SOS House Residents. Specifically, Mr. Bartlet and Mr. Douglas offered that SOS House needed ten people to provide the necessary support, and that a lower number was not practical. (See supra ¶¶ 25, 27.) Ms. Aniskevich testified during the Hearing on October 6, 2015 as an expert in the benefits of sober homes, wherein she opined that sober homes were critical for recovery, and that a sober house needed at least eight people to be successful. (See supra ¶ 27.) Mr. Bedford testified at the hearing on October 6, 2015 as an expert in the area of the effectiveness and benefits of sober houses, wherein he opined that a sober house provides the benefit of living in a community/family environment, which is "optimal"

with seven to ten people." (See supra ¶ 27.)  Plaintiffs have also introduced statements from SOS House's residents regarding the benefits of a community environment within the home as evidence of the necessity of such homes. (See supra ¶ 27.)

However, Defendants have raised genuine issue of material fact as to the question of necessity through the testimony of another expert, Dr. Santoro, who testified during the ZHB Hearing as an expert in drug and alcohol addiction, wherein he opined that a sober house can operate with three people, but five to eight residents is optimal.  (See supra ¶ 44.)  Defendants also challenge the professional qualifications of Mr. Bartlet regarding his ability to opine on the necessity of a certain number of residents.  (See supra ¶ 27.)  Given that the parties have presented genuine disputes as to the factual question of necessity, I find that none of the parties are entitled to summary judgment on this point as a matter of law.

### Defendants' Demonstration of "Reasonableness"

Even assuming that Plaintiffs established necessity for the purposes of summary judgment, the burden would then shift to Defendants to show that the accommodation was not reasonable by proving that Defendants "could not have granted the variance without: (1) imposing undue financial and administrative burden; (2) imposing an undue hardship upon the township; or (3) requiring a fundamental alteration in the nature in the zoning program." Lapid-Laurel, L.L.C. v. Zoning Board of Adjustment of the Township of Scotch Plains, 284 F.3d 442, 462 (3d Cir. 2002).

In attempting to establish undue hardship, Defendants argue that the accommodation would impose an undue burden on parking.  As evidence of this undue hardship, Defendants introduced a parking study that concluded ten adults would likely exceed the parking capacity.  (See supra ¶ 43.)  Plaintiffs countered by offering to restrict the availability of parking to its residents.  (See

*supra* ¶ 29.) When asked about this proposed solution, Mr. Berenson, a ZHB member, responded that the parking concern was not just about the number of residents but their visitors. However, Mr. Berenson could not recall whether the Zoning Ordinance permitted the ZHB to limit visitor parking to a particular residence. Additionally, Mr. Kratowicz, another ZHB member, explained that Mr. Bartlet's statement about limiting the amount of cars was not sufficient because he was "not so sure how he could agree or guarantee that there were only four cars within the property." (See *supra* ¶¶ 29, 38, 41.)

Defendants also argue that the request was unreasonable because permitting SOS House to have ten residents would "fundamentally alter the nature of the zoning program," given that the Zoning District of the Property intended only to serve families and family-equivalents. Defendants point to the fact that Plaintiffs failed to satisfy the "family equivalent" zoning requirement, which required SOS House to be a "nonprofit" and "non-transient" unit. In support, Defendants introduced an expert, Mr. Duffy, who conducted a financial analysis and concluded that SOS House was a for-profit corporation. (See *supra* ¶ 45.) Additionally, Defendants point to the testimony that established the "transient" nature of the residents, where SOS House had experienced high resident turnover in a few short months. (See *supra* ¶¶ 36, 38, 41.)

Plaintiffs have raised genuine issue of material fact as to the question of "reasonableness" by pointing to the fact that the Zoning Ordinance did not expressly define the terms "nonprofit" or "transient." Because the terms were not defined, Plaintiffs assert that a factfinder could find that they sufficiently established that SOS House was a nonprofit entity through Mr. Bartlet and Mr. Douglas, who testified during the ZHB Hearings that SOS House was legally a nonprofit entity under Pennsylvania law at the time of the application. (See *supra* ¶ 4.) Moreover, a factfinder could find that Plaintiffs sufficiently established that the residents of SOS House were "non-

transient," depending on the interpretation of this undefined term, given the expert testimony provided during the ZHB Hearings on this point.  (See supra ¶ 13.)

Under the Third Circuit's burden-shifting analysis, Plaintiffs are required to establish the "necessity" of the accommodation for 10 unrelated residents, and Defendants then must establish the "unreasonableness" of this requested accommodation.  Lapid-Laurel, L.L.C. v. Zoning Board of Adjustment of the Township of Scotch Plains, 284 F.3d 442, 457–58 (3d Cir. 2002).  Given the existence of the aforementioned disputed material facts, I find that none of the parties are entitled to summary judgment as to the Reasonable Accommodation Claim.

## V.    CONCLUSION

For the foregoing reasons, I conclude that Plaintiffs' Motion for Summary Judgment and Defendants' Motion for Summary Judgment should be denied.

An appropriate Order follows.